STATE OF MICHIGAN v McQUEEN

Docket No. 301951. Submitted June 7, 2011, at Lansing. Decided August
23, 2011, at 9:00 a.m. Leave to appeal granted, 491 Mich 890.

On behalf of the state of Michigan, the Isabella County Prosecuting
Attorney filed a complaint for a temporary restraining order, a
show cause order, a preliminary injunction, and a permanent
injunction, seeking to enjoin the operation of the Compassionate
Apothecary, LLC (CA), a medical-marijuana dispensary that was
owned and operated by Brandon McQueen and Matthew Taylor.
McQueen was a registered qualifying patient and a registered
primary caregiver for three qualifying patients under the Michi-
gan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*
Taylor was the registered primary caregiver for two qualifying
patients. They operated CA as a membership organization. To be a
member of CA, an individual had to be either a registered
qualifying patient or a registered primary caregiver. Caregivers
could only be members of CA if a qualifying patient to whom he or
she was connected through the Department of Community
Health's registration process was also a member. Patients and
caregivers who were members of CA could rent lockers from CA. A
patient who rented a locker from CA had grown more marijuana
than the patient needed to treat his or her debilitating medical
condition and wanted to make the excess available to other
patients. Caregivers would rent lockers when the caregiver's
patients did not need all of the marijuana that the caregiver had
grown. Patients and caregivers desiring to purchase marijuana
from CA could view the available marijuana strains in CA's display
room. After the patient or caregiver had made their selection, a CA
employee would retrieve the marijuana from the appropriate
locker, weigh and package the marijuana, and record the purchase.
The price of the marijuana would be set by the member who rented
the locker, but CA kept a service fee for each transaction. The
prosecuting attorney alleged that McQueen and Taylor's operation
of CA did not comply with the MMMA, was contrary to the Public
Health Code (PHC), MCL 333.1101 *et seq.*, and, thus, was a public
nuisance. The court, Paul H. Chamberlin, C.J., denied the pros-
ecuting attorney's requests for a temporary restraining order and
a show cause order. After a hearing, the court further denied the

prosecuting attorney's request for a preliminary injunction and closed the case, concluding that the operation of CA was in compliance with the MMMA because the patient-to-patient transfers of marijuana that CA facilitated fell within the act's definition of the "medical use" of marijuana. The prosecuting attorney appealed.

The Court of Appeals *held*:

1. The trial court clearly erred when it concluded that Mc-Queen and Taylor did not possess the marijuana stored at CA because they did not have an ownership interest in it. A person can possess a controlled substance without owning it. McQueen and Taylor were in possession of the marijuana that was stored in the lockers because they exercised dominion and control over that marijuana when they showed it to prospective purchasers, retrieved and packaged it for purchasers, and provided it to the purchasers in exchange for monetary payment.

2. The MMMA operates under the framework established by the PHC that it is illegal to possess, use, or deliver marijuana, but sets forth limited circumstances in which persons involved with the medical use of marijuana may avoid criminal liability. Under MCL 333.26424(d), if a qualifying patient or primary caregiver is in possession of a registry identification card and an amount of marijuana that does not exceed that allowed by the MMMA, the act presumes that the qualifying patient or the primary caregiver is engaged in the medical use of marijuana in accordance with the act. However, the presumption may be rebutted by evidence that the conduct of the patient or caregiver was not in accordance with the act. The definition of the "medical use" of marijuana under the MMMA includes the "delivery" and "transfer" of marijuana, but does not include the "sale" of marijuana. A "sale" is the transfer of property or title for a price. In this case, the presumption of medical use was rebutted because McQueen and Taylor, through their operation of CA, engaged in patient-to-patient sales of marijuana. CA's members delivered or transferred marijuana to other members for a price, and CA also charged a minimum twenty percent share of the price for facilitating the transfer. McQueen and Taylor engaged in the sale of marijuana when they made possible and actively engaged in the sale of marijuana between CA members.

3. Under MCL 333.26424(i), the MMMA affords immunity to those who are in the presence or vicinity of the medical use of marijuana and to those who are assisting a registered qualifying patient with using or administering marijuana. The "use or administration" of marijuana is more limited in meaning than is

"medical use." A person assists a registered qualifying patient with using or administering marijuana when the person assists the patient in preparing the marijuana to be consumed in any of the various ways in which marijuana is commonly consumed or by physically aiding the patient in consuming the marijuana. In this case, McQueen and Taylor's sale of marijuana was not encompassed within the use or administration of marijuana under the MMMA.

4. Actions in violation of law constitute a public nuisance, and the public is presumed harmed by the violation of a statute enacted to preserve public health, safety, and welfare. The PHC is designed to protect the health, safety, and welfare of the people, and the public is thus presumed to have been harmed by its violation. In this case, McQueen and Taylor violated the PHC, and their conduct was presumed to be a public nuisance. Under the circumstances, the trial court improperly denied injunctive relief.

Reversed and remanded for entry of judgment in favor of plaintiff.

1. CONTROLLED SUBSTANCES — MARIJUANA — MEDICAL MARIJUANA — MEDICAL-USE PRESUMPTION — SALE OF MARIJUANA.

Under the Michigan Medical Marihuana Act, if a qualifying patient or primary caregiver is in possession of a registry identification card and an amount of marijuana that does not exceed that allowed by the act, the qualifying patient or the primary caregiver is presumed to be engaged in the medical use of marijuana in accordance with the act; the presumption may be rebutted by evidence that the conduct of the patient or caregiver was not in accordance with the act; the definition of the "medical use" of marijuana under the act includes the "delivery" and "transfer" of marijuana, but does not include the "sale" of marijuana; a "sale" is the transfer of property or title for a price; one who engages in patient-to-patient sales of marijuana is not acting in accordance with the act and is not entitled to the presumption of medical use (MCL 333.26424[d]).

2. CONTROLLED SUBSTANCES — MARIJUANA — MEDICAL MARIJUANA — IMMUNITY FROM PROSECUTION — ASSISTING A REGISTERED QUALIFYING PATIENT WITH THE MEDICAL USE OF MARIJUANA.

The Michigan Medical Marihuana Act affords immunity to those who are in the presence or vicinity of the medical use of marijuana and to those who are assisting a registered qualifying patient with using or administering marijuana; the "use or administration" of marijuana is more limited in meaning than is "medical use;" a person assists a registered qualifying patient with using or admin-

istering marijuana when the person assists the patient in preparing the marijuana to be consumed in any of the various ways in which marijuana is commonly consumed or by physically aiding the patient in consuming the marijuana (MCL 333.26424[i]).

3. NUISANCE — VIOLATIONS OF THE PUBLIC HEALTH CODE — PRESUMPTION OF HARM.

Actions in violation of law constitute a public nuisance, and the public is presumed harmed by the violation of a statute enacted to preserve public health, safety, and welfare; the Public Health Code is designed to protect the health, safety, and welfare of the people, and the public is presumed to be harmed by its violation. (MCL 333.1101 *et seq.*)

*Larry J. Burdick*, Prosecuting Attorney, for plaintiff.

*Hall, Lewis, & Bolles, P.C.* (by *John W. Lewis*), for defendants.

Amici Curiae:

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Heather S. Meingast* and *Allison M. Dietz*, Assistant Attorneys General, for the Attorney General.

*Newburg Law, PLLC* (by *Matthew R. Newburg*), for the Michigan Association of Compassion Centers.

Before: MURRAY, P.J., and HOEKSTRA and STEPHENS, JJ.

HOEKSTRA, J. This case requires us to decide whether the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*, permits the selling of marijuana.[1] Defendants Brandon McQueen and Matthew Taylor own and operate Compassionate Apothecary, LLC (CA), a medical-marijuana dispensary. It is a place where CA members, who are either registered qualifying patients

---

[1] Although the Legislature spells the word "marihuana" we use the more common "marijuana."

or their primary caregivers, purchase marijuana that other CA members have stored in lockers rented from CA. Through their operation of CA, defendants provide the mechanism for the sale of marijuana and retain at least 20 percent of the sale price. Plaintiff, through the Isabella County Prosecuting Attorney, filed a complaint against defendants for injunctive relief. It claimed that defendants' operation of CA was not in accordance with the provisions of the MMMA and, therefore, was a public nuisance because it violated the Public Health Code (PHC), MCL 333.1101 *et seq*. After a two-day hearing, the trial court held that defendants operated CA in accordance with the provisions of the MMMA. Consequently, it denied plaintiff's request for injunctive relief. We hold that defendants' operation of CA is an enjoinable public nuisance. The operation of CA violates the PHC, which prohibits the possession and delivery of marijuana. Defendants' violation of the PHC is not excused by the MMMA because defendants do not operate CA in accordance with the provisions of the MMMA. Specifically, the "medical use" of marijuana, as defined by the MMMA, MCL 333.26423(e), does not include patient-to-patient sales of marijuana, and no other provision of the MMMA can be read to permit such sales. Therefore, defendants have no authority to actively engage in and carry out the selling of marijuana between CA members. Accordingly, we reverse the trial court's order denying plaintiff's request for a preliminary injunction and remand for entry of judgment in favor of plaintiff.

## I. FACTS AND PROCEDURAL HISTORY

The facts regarding defendants' operation of CA are generally undisputed. They were established at a two-day hearing at which both McQueen and Taylor testified.

McQueen is a "qualifying patient," MCL 333.26423(h), who has been issued a "registry identification card," MCL 333.26423(i), by the Michigan Department of Community Health (MDCH). He is also the registered "primary caregiver," MCL 333.26423(g), for three qualifying patients.[2] Taylor is not a qualifying patient, but he is the registered primary caregiver for two qualifying patients. Together, McQueen and Taylor operate CA, which can be described as a medical-marijuana dispensary.[3] The goal of CA is to provide an uninterrupted supply of marijuana to registered qualifying patients. According to defendants, it does this by facilitating patient-to-patient transfers of marijuana between its members.

There are approximately 345 members of CA. To be a member of CA, an individual must either be a qualifying patient or a primary caregiver and must possess a registry identification card from the MDCH. In addition, a caregiver can only be a member if a qualifying patient to whom he or she is connected through the MDCH registration process is a member. A CA membership costs $5 a month. CA retains the right to revoke a membership if the member uses marijuana for a purpose other than the treatment of a medical condition.

CA has 27 lockers that it rents to its members. The cost to rent one locker is $50 a month.[4] Either patients or caregivers may rent lockers, but the majority of CA members that rent lockers are patients. A patient who

---

[2] McQueen was the primary caregiver for a fourth patient but that patient "lapsed." The record does not indicate when the patient lapsed.

[3] During the course of the proceedings below, defendants learned that the word "apothecary" can legally only be used in the name of pharmacies. Thus, they changed the name of their operation to "C.A., LLC."

[4] Additional lockers may be rented at a lower monthly price.

rents a locker has grown more marijuana than the patient needs to treat his or her debilitating medical condition and the patient wants to make the "excess" marijuana available to other patients. Similarly, a caregiver rents a locker when the caregiver's patient does not need all the marijuana that was grown by the caregiver.[5] When a caregiver rents a locker, the caregiver's patient must provide an attestation giving the caregiver permission to store the marijuana in the locker and allowing CA to distribute the marijuana to other members. CA limits the amount of marijuana that a patient or caregiver can place in a locker. A patient may store 2.5 ounces of marijuana, while a caregiver may store 2.5 ounces of marijuana for each of his or her patients. According to McQueen and Taylor, the marijuana placed in the rented lockers belongs to a patient—either the patient who rented the locker or the patient of the caregiver who rented the locker. CA does not purchase marijuana from its members or from third parties.

When a patient comes to CA to purchase marijuana, one of CA's four employees verifies that the patient has been issued a registry identification card by the MDCH and is a CA member. A caregiver may also purchase marijuana from CA for his or her patients. The patient or caregiver is escorted into the display room by a CA employee, where the member is permitted to view, smell, and touch samples of the different strains of marijuana that are currently stored in the lockers.[6] The

[5] McQueen testified that he assumes the marijuana placed in a locker by a member was grown by that patient or caregiver. However, he admitted that he could not be sure that the member did not obtain the marijuana from some other place or source.

[6] "Strains" of marijuana refer to different genetic varieties of marijuana. Taylor explained that each strain of marijuana requires different growing conditions and, therefore, it is "very ineffective" for a person to

member, however, may not smoke the marijuana at CA; CA is a no-grow and no-smoke facility. The number of marijuana strains available to CA members fluctuates. The number of available strains has been as high as 26 and as low as 5 or 6. After the patient or caregiver selects a strain of marijuana to purchase, a CA employee retrieves the marijuana from the locker, weighs and packages the marijuana, and records the purchase. CA limits the amount of marijuana that a member may purchase to 2.5 ounces in a 14-day period. The price of the marijuana is set by the member who rented the locker, but CA keeps, at a minimum, a 20 percent "service fee" for each transaction.

Defendants opened CA in May 2010. In the first 2½ months of its operation, it sold approximately 19 pounds of marijuana. Its "farmers" made more than $76,000.[7] Before expenses were paid, CA earned approximately $21,000.

In July 2010, plaintiff, through the Isabella County Prosecuting Attorney, filed a complaint for a temporary restraining order, preliminary injunction, and permanent injunction against defendants. Plaintiff alleged that defendants' operation of CA did not comply with the provisions of the MMMA because the MMMA does not allow patient-to-patient transfers or sales of marijuana, nor does it allow marijuana taken from one caregiver to be dispensed to patients who are not the registered qualifying patients of the caregiver. Plaintiff claimed that defendants' operation of CA was a public

grow more than one or two strains of marijuana. By making different strains available to its members, CA allows patients to use a "trial and error" method to determine which strain works best for him or her.

[7] McQueen used the term "farmers" while speaking before the Mount Pleasant City Commission, and he did not explain the term. It appears that the term "farmers" refers to the members who rent lockers and allow CA to distribute their marijuana to other members.

nuisance because it was contrary to the provisions of the MMMA and, therefore, in violation of the PHC.

The trial court denied plaintiff's request for a temporary restraining order. Then, after a two-day hearing, it denied the request for a preliminary injunction. According to the trial court, defendants' operation of CA was in compliance with the MMMA because the patient-to-patient transfers of marijuana that CA facilitates fall within the scope of the medical use of marijuana. The trial court stated that its order resolved the last pending claim and closed the case.[8]

## II. ANALYSIS

On appeal, plaintiff argues that the trial court erred by denying it injunctive relief. According to plaintiff, the provisions of the MMMA do not authorize patient-to-patient sales of marijuana. Therefore, plaintiff claims that defendants' operation of CA, which carries out patient-to-patient sales of marijuana, is not in accordance with the provisions of the MMMA. Plaintiff asserts that, without the protection of the MMMA, defendants' operation of CA is an enjoinable nuisance because it violates the PHC.

### A. STANDARDS OF REVIEW

We review a trial court's denial of injunctive relief for an abuse of discretion. *Mich Coalition of State Employee Unions v Civil Serv Comm*, 465 Mich 212, 217; 634 NW2d 692 (2001). An abuse of discretion occurs when

---

[8] At the conclusion of the two-day hearing, defendants urged the trial court that if it viewed its order on plaintiff's request for a preliminary injunction to be a final order, such that it only intended to issue one opinion regarding whether any injunctive relief was available to plaintiff, to indicate in its order that it was a final order so that the losing party could immediately exercise its appellate rights.

the trial court's decision falls outside the range of principled outcomes. *Detroit Fire Fighters Ass'n, IAFF Local 344 v Detroit*, 482 Mich 18, 28; 753 NW2d 579 (2008). We review a trial court's factual findings for clear error. *Christiansen v Gerrish Twp*, 239 Mich App 380, 387; 608 NW2d 83 (2000). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *In re Bennett Estate*, 255 Mich App 545, 549; 662 NW2d 772 (2003). We review de novo the trial court's interpretation of the MMMA. *People v Redden*, 290 Mich App 65, 76; 799 NW2d 184 (2010).

> "The words of an initiative law are given their ordinary and customary meaning as would have been understood by the voters." *Welch Foods, Inc v Attorney General*, 213 Mich App 459, 461; 540 NW2d 693 (1995). We presume that the meaning as plainly expressed in the statute is what was intended. *Id.* [*Redden*, 290 Mich App at 76.]

### B. PRELIMINARY ISSUES

In its opinion, the trial court made two findings of fact that were critical to its determination that defendants operated CA in accordance with the MMMA. First, it found that even though defendants, in their operation of CA, owned the lockers that CA rents to its members, it was the members who rent the lockers, and not defendants, who possess the marijuana stored in the lockers. Second, it found that defendants did not own, purchase, or sell the marijuana stored in the lockers but merely facilitated its transfer from "patient to patient." Reviewing these two findings under the proper definitions for "possessing" and "selling," we are left with a definite and firm conviction that the trial court made mistakes.

1. POSSESSION

The term "possession," when used in regard to controlled substances, "signifies dominion or right of control over the drug with knowledge of its presence and character." *People v Nunez*, 242 Mich App 610, 615; 619 NW2d 550 (2000) (quotation marks and citation omitted). Possession may be actual or constructive, and may be joint or exclusive. *People v McKinney*, 258 Mich App 157, 166; 670 NW2d 254 (2003). "The essential issue is whether the defendant exercised dominion or control over the substance." *Id.* A person can possess a controlled substance and not be the owner of the substance. *People v Wolfe*, 440 Mich 508, 520; 489 NW2d 748 (1992).

In this case, defendants exercise dominion and control over the marijuana that is stored in the lockers that CA rents to its members. A member, either a patient or a caregiver, rents a locker when the member has excess marijuana that he or she wants to make available for purchase by other CA members. The member gives consent to CA to convey the marijuana to other members. Defendants, while they may not actually own the marijuana that is stored in the lockers, have access to and control over the marijuana. When a member comes to CA to purchase marijuana, the member, under the supervision of a CA employee, inspects samples of the available strains of marijuana, and after the member selects a strain of marijuana to purchase, the CA employee retrieves the marijuana from the respective locker, weighs and packages the marijuana, and provides it to the member in exchange for monetary payment. Under these circumstances, defendants, in their operation of CA, exercise dominion and control over the marijuana. They possess the marijuana that is stored in the lockers. The trial court's finding to the

contrary, that defendants did not possess the marijuana because they did not have an ownership interest in it, was clearly erroneous.

### 2. SELLING

Likewise, defendants are engaged in the selling of the marijuana that CA members store in the rented lockers. See part II(C)(3)(b), later in this opinion, in which we define a "sale" as the transfer of property or title for a price. Admittedly, defendants do not sell marijuana that they themselves own, but they intend for, make possible, and actively engage in the sale of marijuana between CA members. Defendants rent lockers to members who want to sell their excess marijuana. They, or another CA employee, supervise members' inspections of the samples of the marijuana strains stored in the lockers, and after a member selects a strain of marijuana to purchase, they weigh and package the marijuana. They also collect the purchase price. After a 20 percent service fee is deducted for CA, the remainder of the purchase money is given to the CA member who supplied the marijuana. Without defendants' involvement, there would be no sales. Under these circumstances, defendants are not just facilitating the transfers of marijuana between CA members, they are full participants in the selling of marijuana.

### C. THE SELLING OF MARIJUANA

The heart of this case is whether patient-to-patient sales of marijuana are in accordance with the provisions of the MMMA. To answer this question, we must examine not only the provisions of the MMMA but also article 7 of the PHC, MCL 333.7101 *et seq.*, which governs the manufacturing, distributing, prescribing, and dispensing of controlled substances.

1. THE PUBLIC HEALTH CODE

The PHC is designed to protect the health, safety, and welfare of the people of the state of Michigan. MCL 333.1111(2); *People v Derror*, 475 Mich 316, 329; 715 NW2d 822 (2006), overruled on other grounds *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010). In furtherance of that mandate, article 7 of the PHC regulates "controlled substances." "Controlled substances" are those drugs, substances or immediate precursors included in schedules 1 to 5 of part 72 of the PHC. MCL 333.7104(2).

Controlled substances are assigned to one of five schedules according to their potential for abuse, the level of dependency to which abuse may lead, and medically accepted uses. The controlled substances listed in schedule 1 have been found by the Michigan Board of Pharmacy to have a "high potential for abuse" and have "no accepted medical use in treatment in the United States or lack[] accepted safety for use in treatment under medical supervision." MCL 333.7211. Schedule 2 controlled substances have "currently accepted medical use in treatment in the United States, or currently accepted medical use with severe restrictions." MCL 333.7213(b). They have a high potential for abuse, and abuse of them may lead to severe psychic or physical dependence. MCL 333.7213(a) and (c). The controlled substances listed in schedules 3, 4, and 5 have currently accepted medical use in treatment in the United States and have less potential for abuse and dependence. MCL 333.7215; MCL 333.7217; MCL 333.7219.

The PHC regulates who may manufacture, distribute, prescribe, or dispense controlled substances. See, e.g., MCL 333.7303(1) (requiring that anyone who engages in these activities shall obtain a license issued by

the Michigan Board of Pharmacy); MCL 333.7331(1) (stating that only a "practitioner" who holds a license to prescribe or dispense controlled substances may purchase from a licensed manufacturer or distributor a schedule 1 or 2 controlled substance). Specifically, we note that a "practitioner"[9] may dispense a schedule 2 controlled substance upon the receipt of a prescription of a practitioner on a prescription form. MCL 333.7333(2). A practitioner may dispense schedule 3, 4, or 5 controlled substances upon the receipt of a written or oral prescription of a practitioner. MCL 333.7333(4). However, MCL 333.7333 contains no provision for the dispensing of schedule 1 controlled substances.

The PHC prohibits a person from knowingly or intentionally possessing or using a controlled substance unless the substance "was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this article." MCL 333.7403(1); MCL 333.7404(1). In addition, the PHC prohibits a person, unless authorized by article 7, from manufacturing, creating, delivering, or possessing a controlled substance, or possessing the substance with the intent to do any of those acts. MCL 333.7401(1). The PHC imposes criminal sanctions for

---

[9] A "practitioner" is defined as:

(a) A prescriber or pharmacist, a scientific investigator as defined by rule of the administrator, or other person licensed, registered, or otherwise permitted to distribute, dispense, conduct research with respect to, or administer a controlled substance in the course of professional practice or research in this state . . . .

(b) A pharmacy, hospital, or other institution or place of professional practice licensed, registered, or otherwise permitted to distribute, prescribe, dispense, conduct research with respect to, or administer a controlled substance in the course of professional practice or research in this state. [MCL 333.7109(3).]

the unauthorized possession, use, manufacture, creation, and delivery of controlled substances. The severity of the sanctions generally depends on which schedule applies to the controlled substance and the amount (in grams) of the controlled substance. See MCL 333.7401(2); MCL 333.7403(2); MCL 333.7404(2).

The PHC classifies marijuana as a schedule 1 controlled substance. MCL 333.7212(1)(c). This means that the Michigan Board of Pharmacy has found that marijuana "has high potential for abuse and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision." MCL 333.7211. Except as authorized by article 7 of the PHC, which allows, under certain circumstances, a practitioner to conduct research with schedule 1 controlled substances, MCL 333.7306(3), the possession and use of marijuana are misdemeanor offenses, MCL 333.7403(2)(d); MCL 333.7404(2)(d), and the manufacture, creation, and delivery of marijuana are felony offenses, MCL 333.7401(2)(d).

### 2. THE MICHIGAN MEDICAL MARIHUANA ACT

The MMMA stands in sharp contrast to the PHC. Unlike the PHC's classification of marijuana as a schedule 1 controlled substance, the MMMA, which was enacted as the result of an initiative adopted by voters in the November 2008 election, *Redden*, 290 Mich App at 76, declares that as discovered by modern medical research there are beneficial uses for marijuana in treating or alleviating the symptoms associated with a variety of debilitating medical conditions. MCL 333.26422(a). Nonetheless, the MMMA operates under the framework, established by the PHC, that it is illegal to possess, use, or deliver marijuana. The MMMA did not legalize the possession, use, or delivery of mari-

juana. *People v King*, 291 Mich App 503, 508-509; 804 NW2d 911 (2011); see also *Redden*, 290 Mich App at 92 (O'CONNELL, P.J., concurring) ("The MMMA does not repeal any drug laws contained in the Public Health Code, and all persons under this state's jurisdiction remain subject to them."). Rather, the MMMA sets forth very limited circumstances in which persons involved with the use of marijuana, and who are thereby violating the PHC, may avoid criminal liability. *King*, 291 Mich App at 509; see also *People v Anderson*, 293 Mich App 33, 48-57; 809 NW2d 176 (2011) (M. J. KELLY, J., concurring).

To provide a limited exemption from the PHC's regulations and criminal sanctions for the possession, use, and delivery of marijuana, the MMMA provides that "[t]he medical use of marihuana is allowed under state law to the extent that it is carried out in accordance with the provisions of th[e] act." MCL 333.26427(a). It further provides that "[a]ll other acts and parts of acts inconsistent with this act do not apply to the medical use of marihuana as provided for by this act." MCL 333.26427(e). The MMMA broadly defines the "medical use" of marijuana as "the acquisition, possession, cultivation, manufacture, use, internal possession, delivery, transfer, or transportation of marihuana or paraphernalia relating to the administration of marihuana to treat or alleviate a registered qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition." MCL 333.26423(e).[10]

---

[10] The MMMA does not allow for the medical use of marijuana in all circumstances. See MCL 333.26427(b). A person may not possess marijuana or engage in the medical use of marijuana in a school bus, on the grounds of a preschool or a primary or secondary school, or in a correctional facility, MCL 333.26427(b)(2); a person may not smoke

The MMMA provides a registration system for "qualifying patients" and "primary caregivers." The MDCH shall issue a "registry identification card" to a "qualifying patient," defined as "a person who has been diagnosed by a physician as having a debilitating medical condition," MCL 333.26423(h), and who submits the necessary application and information, MCL 333.26426(a) and (c). If the qualifying patient has a "primary caregiver," defined as "a person who is at least 21 years old and who has agreed to assist with a patient's medical use of marihuana," MCL 333.26423(g), the qualifying patient shall inform the MDCH of the primary caregiver and state whether the qualifying patient or the primary caregiver will possess marijuana plants for the qualifying patient's medical use, MCL 333.26426(a)(5) and (6). If the MDCH approves the qualifying patient's application and the qualifying patient has identified a primary caregiver, the MDCH shall also issue a registry identification card to the primary caregiver. MCL 333.26426(d). The registry identification cards must have a clear designation whether the qualifying patient or the primary caregiver is allowed to possess marijuana plants. MCL 333.26426(e)(6). "[E]ach qualifying patient can have no more than 1 primary caregiver, and a primary caregiver may assist no more than 5 qualifying patients with their medical use of marihuana." MCL 333.26426(d).

The issues raised in this appeal directly involve several provisions of § 4 of the MMMA. Section 4 grants immunity to qualifying patients and primary caregivers

_____

marijuana on any form of public transportation or in a public place, MCL 333.26427(b)(3); a person may not operate a motor vehicle, aircraft, or motor boat while under the influence of marijuana, MCL 333.26427(b)(4); and a person may not use marijuana if the person does not have a serious or debilitating medical condition, MCL 333.26427(b)(5).

who have been issued a registry identification card. MCL 333.26424(a) and (b); see also *Anderson*, 293 Mich App at 45-47 (M. J. KELLY, J., concurring). MCL 333.26424(a) provides:

> A qualifying patient who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for the medical use of marihuana in accordance with this act, provided that the qualifying patient possesses an amount of marihuana that does not exceed 2.5 ounces of usable marihuana, and, if the qualifying patient has not specified that a primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility. Any incidental amount of seeds, stalks, and unusable roots shall also be allowed under state law and shall not be included in this amount.

Similar immunity is granted to a primary caregiver. MCL 333.26424(b) provides:

> A primary caregiver who has been issued and possesses a registry identification card shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, for assisting a qualifying patient to whom he or she is connected through the [MDCH's] registration process with the medical use of marihuana in accordance with this act, provided that the primary caregiver possesses an amount of that does not exceed:
>
> (1) 2.5 ounces of usable marihuana for each qualifying patient to whom he or she is connected through the [MDCH's] registration process; and
>
> (2) for each registered qualifying patient who has specified that the primary caregiver will be allowed under state

law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility; and

(3) any incidental amount of seeds, stalks, and unusable roots.

"A registered primary caregiver may receive compensation for costs associated with assisting a registered qualifying patient in the medical use of marihuana." MCL 333.26424(e). This compensation does not constitute the sale of marijuana. *Id.*

If a qualifying patient or primary caregiver is in possession of a registry identification card and an amount of marijuana that does not exceed that allowed by the MMMA, § 4(d) provides a presumption that the qualifying patient or the primary caregiver "is engaged in the medical use of marihuana in accordance with th[e] act . . . ." MCL 333.26424(d)(1) and (2). "The presumption may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, in accordance with th[e] act." MCL 333.26424(d)(2).

In addition, § 4(i) provides immunity for a "person" who assists a registered qualifying patient with "using or administering marihuana." MCL 333.26424(i) provides:

A person shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege, including but not limited to civil penalty or disciplinary action by a business or occupational or professional licensing board or bureau, solely for being in the presence or vicinity of the medical use of marihuana in accordance with this act, or for assisting a registered qualifying patient with using or administering marihuana.

Finally, § 4(k) imposes criminal sanctions on any registered qualifying patient or registered primary caregiver who sells marijuana to a person that is not

allowed to use marijuana for medical purposes. MCL 333.26424(k). The patient's or caregiver's registry identification card shall be revoked and the person is guilty of a felony punishable for not more than 2 years' imprisonment or a fine of not more than $2,000, or both, in addition to any other penalties for the distribution of marijuana. *Id.*[11]

### 3. DEFENDANTS' OPERATION OF CA

Having set forth the relevant statutory provisions of the MMMA and the PHC, we now apply the provisions of the MMMA to defendants' operation of CA to determine whether it is in accordance with the MMMA or remains illegal under the PHC.[12] Unlike the PHC, which contains provisions for dispensing schedule 2, 3, 4, and 5 controlled substances, the MMMA has no provision governing the dispensing of marijuana. While the MMMA indicates that a qualifying patient may obtain marijuana from his or her primary caregiver, see MCL 333.26424(b)(1), the MMMA does not state how a primary caregiver or a qualifying patient, if the patient does not have a primary caregiver, is to obtain marijuana. Specifically, in regard to this case, the MMMA does not authorize marijuana dispensaries. In addition, the MMMA does not expressly state that patients may sell their marijuana to other patients. Defendants, therefore, are left with inferring the authority to operate a dispensary from various provisions of the MMMA.

---

[11] Section 8 of the MMMA provides an affirmative defense of "medical purpose" for any prosecution involving marijuana. MCL 333.26428. Defendants do not rely on § 8 in arguing that their operation of CA is in accordance with the provisions of the MMMA and, therefore, it is not at issue in this case.

[12] Defendants do not dispute that the operation of CA is prohibited by the PHC.

Defendants rely on various provisions of § 4 to argue that the MMMA authorizes patient-to-patient sales of marijuana and that they, as registered primary caregivers and a registered qualifying patient may actively participate in and carry out those sales and receive compensation for their assistance through their operation of CA. Defendants argue that because the medical use of marijuana permits the "delivery" and "transfer" of marijuana, patients can transfer marijuana between themselves. MCL 333.26423(e). They assert that § 4(i) entitles them to assist registered qualifying patients with patient-to-patient transfers and that § 4(e) allows them to be compensated for their assistance. Defendants also assert that they are entitled to the presumption of § 4(d) that they are engaged in the medical use of marijuana.

### a. THE MEDICAL-USE PRESUMPTION

Initially, we address defendants' contention and the trial court's finding that defendants are entitled to the presumption under § 4(d) that they are engaged in the medical use of marijuana when operating CA. Under § 4(d), there is a presumption that a qualifying patient or a primary caregiver is engaged in the medical use of marijuana in accordance with the MMMA if the patient or caregiver is in possession of (1) a registry identification card and (2) an amount of marijuana that does not exceed the amount allowed by the MMMA. MCL 333.26424(d).

However, the presumption may be rebutted. It "may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, *in accordance with this act.*" MCL 333.26424(d)(2)

(emphasis added). It is well established that in construing a statute a court must give effect to every provision, if possible. *Wolverine Power Supply Coop, Inc v Dep't of Environmental Quality*, 285 Mich App 548, 558; 777 NW2d 1 (2009). In order to give meaning to the phrase "in accordance with this act," we hold that the presumption may be rebutted with evidence that the conduct of the patient or the caregiver was not in accordance with the provisions of the MMMA. The inclusion of the phrase "in accordance with this act" reiterates the overarching principle of the MMMA, stated in § 7(a), that the medical use of marijuana is only permitted to the extent that it is carried out in accordance with the provisions of the MMMA.

Assuming that defendants, who are in possession of registry identification cards, possess an amount of marijuana that does not exceed the amount allowed under the MMMA,[13] the resulting presumption that

---

[13] The trial court held that defendants were entitled to the presumption in light of its erroneous finding that defendants do not possess the marijuana that CA members place in the rented lockers. We observe that although there were no findings by the trial court on whether the amount of marijuana stored in the lockers ever exceeded the amount that defendants are entitled to possess under the MMMA, given the evidence presented, it could reasonably be inferred that defendants possessed more marijuana than allowed by the MMMA.

McQueen, as a registered qualifying patient and the current primary caregiver for three qualifying patients, may possess 10 ounces of usable marijuana. Taylor, as the primary caregiver for two qualifying patients, may possess 5 ounces of marijuana. CA has 27 lockers available for rent. If each locker is rented, and each member renting a locker places 2.5 ounces of marijuana in the locker, then defendants could possess as much as 67.5 ounces of marijuana. This greatly exceeds the amount of marijuana that defendants are allowed to possess. However, McQueen testified that the number of lockers rented fluctuates; the number of rented lockers has been as high as 23 or 24 and as low as 7 or 10. Taylor testified that he did not believe the amount of marijuana placed in the lockers ever exceeded the amounts that he and McQueen were allowed to

defendants are engaged in the medical use of marijuana is rebutted. It is rebutted because defendants' conduct relating to marijuana is not in accordance with the MMMA. As this opinion establishes, *infra*, defendants, through their operation of CA, are actively engaged in patient-to-patient sales of marijuana, and the MMMA does not authorize those sales. Accordingly, defendants are not entitled to the presumption that they are engaged in the medical use of marijuana.[14]

b. THE SALE OF MARIJUANA

Although defendants are not entitled to the presumption that they are engaged in the medical use of

possess. Nonetheless, there was no evidence that defendants have instituted any procedure or plan to ensure that the amount of marijuana stored in the lockers does not exceed the amount that defendants may possess. In addition, the evidence established that in the first $2^{1}/_{2}$ months of operating CA, defendants sold 19 pounds—or 304 ounces—to CA members. This large amount of marijuana that has passed through defendants' possession provides a strong inference that defendants in their operation of CA have, in fact, possessed more marijuana than they are authorized to possess under the MMMA.

[14] We note that, although not raised below or on appeal, there is evidence from which one could conclude that defendants' operation of CA is for a purpose other than alleviating patients' debilitating medical conditions. Defendants organized CA as a limited liability company and implemented a business plan whereby they operate CA by obtaining possession of and selling marijuana. Although defendants make members' excess marijuana available to other patients who may not have the ability to grow marijuana themselves, the evidence shows that this occurs through defendants' operation of CA as a business. The operation of CA is indistinguishable from the operation of a neighborhood pharmacy. The purpose of both CA and a neighborhood pharmacy is to provide medications to alleviate the medical needs of customers. However, a pharmacy could not continue to operate without charging for its services. Likewise, defendants must and do charge for the services offered by CA. And just as is the case with a neighborhood pharmacy, CA could not continue to operate without charging for its services. This evidence of a business purpose indicates that defendants' purpose for operating CA is pecuniary.

marijuana, we must still determine whether, in fact, their operation of CA is in accordance with the provisions of the MMMA. Defendants' argument for why the operation of CA complies with the MMMA relies on the fact that the "medical use" of marijuana includes the "delivery" and "transfer" of marijuana. MCL 333.26423(e). According to defendants, patients are engaged in the medical use of marijuana when they transfer marijuana to other patients.

The MMMA does not define the terms "delivery" or "transfer." But these two words have been given or have acquired peculiar meanings in regard to controlled substances, and we construe them according to those meanings. MCL 8.3a; *People v Edenstrom*, 280 Mich App 75, 80; 760 NW2d 603 (2008). The "delivery" of a controlled substance is the "actual, constructive, or attempted transfer from 1 person to another of [the] controlled substance, whether or not there is an agency relationship." MCL 333.7105(1); see also *People v Williams*, 268 Mich App 416, 422; 707 NW2d 624 (2005).[15] The "transfer" of a controlled substance is the conveyance of the controlled substance from one person to another. *People v Schultz*, 246 Mich App 695, 703-704; 635 NW2d 491 (2001). In this case, there was no dispute before the trial court that members, using the services that defendants provide in operating CA, deliver or transfer marijuana to other CA members. A member rents a locker and places his or her excess marijuana in the locker because the member wants to make it available to other members, and the member gives CA consent to convey the marijuana to other CA members.

---

[15] A person constructively delivers a controlled substance when he or she "directs another person to convey the controlled substance under [his or her] direct or indirect control to a third person or entity." *People v Plunkett*, 281 Mich App 721, 728; 760 NW2d 850 (2008), rev'd on other grounds 485 Mich 50 (2010).

However, members, aided by the services of defendants, do not simply deliver or transfer marijuana to other members. Rather, the members and CA employees deliver or transfer the marijuana to other members for a price. A "sale" is "[t]he transfer of property or title for a price." Black's Law Dictionary (7th ed); see also MCL 440.2106(1) (a "sale," as defined by the Uniform Commercial Code,[16] is "the passing of title from the seller to the buyer for a price"). In this case, the marijuana that a member has placed in a CA locker is only delivered to another member if that member pays the purchase price for the marijuana. After a 20 percent service fee is deducted and retained by CA, the remainder of the purchase money is given to the CA member that rented the locker. Accordingly, members of CA that supply the marijuana, by using the services that defendants provide through their operation of CA, are not just delivering or transferring their excess marijuana; they are selling their excess marijuana.

The question becomes whether the medical use of marijuana permits the sale of marijuana. We hold that it does not because the sale of marijuana is not equivalent to the delivery or transfer of marijuana. The delivery or transfer of marijuana is only one component of the sale of marijuana—the sale of marijuana consists of the delivery or transfer *plus* the receipt of compensation. The "medical use" of marijuana, as defined by the MMMA, allows for the "delivery" and "transfer" of marijuana, but not the "sale" of marijuana. MCL 333.26423(e). We may not ignore, or view as inadvertent, the omission of the term "sale" from the definition of the "medical use" of marijuana. See *People v Burton*, 252 Mich App 130, 135; 651 NW2d 143 (2002) ("It is not the job of the judiciary to write into a statute a provision not

---

[16] MCL 440.1101 *et seq.*

included in its clear language."). Therefore, the "medical use" of marijuana does not include the sale of marijuana, i.e., the conveyance of marijuana for a price.[17]

We note that two other provisions of the MMMA, § 4(e) and § 4(k), refer to the sale or the selling of marijuana. However, neither provision supports defendants' proposition that the MMMA authorizes the sale of marijuana.

First, § 4(e) authorizes a registered primary caregiver to receive compensation for costs associated with assisting a registered qualifying patient in the medical use of marijuana. MCL 333.26424(e). However, § 4(e) goes on to state that "[a]ny such compensation shall not constitute the sale of controlled substances." *Id.* This quoted sentence would not be needed if the definition of the "medical use" of marijuana included the "sale" of marijuana. No statutory provision should be rendered nugatory. *Apsey v Mem Hosp*, 477 Mich 120, 131; 730 NW2d 695 (2007). Consequently, § 4(e) actually supports the conclusion that the medical use of marijuana does not include the sale of marijuana.

Second, § 4(k) states that any registered qualifying patient or registered primary caregiver who sells mari-

---

[17] We emphasize that our conclusion that the medical use of marijuana does not include the sale of marijuana does not lead to the conclusion that the sale of a controlled substance is not prohibited by the PHC, as argued by amicus curiae Michigan Association of Compassion Centers. The PHC does not expressly prohibit a person from engaging in the "sale" of a controlled substance. It only states that, except as authorized by article 7 of the PHC, a person shall not "deliver" or "possess with intent to . . . deliver" a controlled substance. MCL 333.7401(1). However, because the delivery of a controlled substance is a necessary component to the sale of a controlled substance, one cannot engage in the sale of marijuana without violating the PHC. A person who sells a controlled substance necessarily delivers the controlled substance, whether it be an actual, constructive, or attempted delivery, and he or she has, therefore, engaged in a criminal offense if the delivery was not authorized under article 7 of the PHC.

juana to someone who is not permitted to use marijuana for medical purposes shall have his or her registry identification card revoked and is guilty of a felony. MCL 333.26424(k). We agree with Judge O'CONNELL that the fact that § 4(k) "specifies a particular punishment for a specific type of violation does not mean that, by default, the sale of marijuana to someone who *is* allowed to use marijuana for medical purposes under this act is permitted." *Redden*, 290 Mich App at 115 (O'CONNELL, P.J., concurring). If the drafters of the MMMA intended to authorize the sale of marijuana from one qualifying patient to another, "they would have included the term 'sale' in the definition of 'medical use.' " *Id.*

In conclusion, the medical use of marijuana does not include patient-to-patient sales of marijuana, and neither § 4(e) nor § 4(k) permits the sale of marijuana. Defendants, therefore, have no authority under the MMMA to operate a marijuana dispensary that actively engages in and carries out patient-to-patient sales of marijuana.[18] Accordingly, defendants' operation of CA is not in accordance with the provisions of the MMMA.[19]

---

[18] In addition, because the medical use of marijuana does not include the sale of marijuana, defendants are not entitled to receive compensation for the costs of assisting in the sale of marijuana between CA members. See MCL 333.26424(e) ("A registered primary caregiver may receive compensation for costs associated with assisting a registered qualifying patient in the medical use of marihuana."). Also, in regard to § 4(e), the parties disagree whether a registered primary caregiver may receive compensation for the costs associated with assisting *any* registered qualifying patient in the medical use of marijuana or whether a registered primary caregiver may only receive compensation for assisting the qualifying patients with whom he or she is connected through the MDCH registry process. Because of our conclusion that the medical use of marijuana does not include the sale of marijuana, we need not, and therefore do not, resolve this dispute.

[19] Plaintiff and the Attorney General, as amicus curiae, ask us to hold that patient-to-patient conveyances of marijuana that are without com-

c. IMMUNITY UNDER § 4(i)

Further, even if the medical use of marijuana included the sale of marijuana, defendants would not be entitled to the immunity afforded under § 4 from arrest, prosecution, penalty in any manner, or the denial of any right or privilege.

We note that §§ 4(a) and 4(b) grant immunity to qualifying patients and primary caregivers who have been issued and possess a registry identification card. And while defendants are primary caregivers who have been issued and possess registry identification cards, and McQueen is also a qualifying patient who has been issued and possesses a registry identification card, defendants do not claim they are entitled to immunity under either § 4(a) or § 4(b). Rather, they claim that they are entitled to immunity under § 4(i).

Under § 4(i),

[a] person shall not be subject to arrest, prosecution, or penalty in any manner, or denied any right or privilege . . . solely for being in the presence or vicinity of the *medical use* of marihuana in accordance with this act, *or* for assisting a registered qualifying patient with *using or administering* marihuana. [MCL 333.26424(i) (emphasis added).]

The word "or" is a disjunctive term. *People v Kowalski*, 489 Mich 488, 499; 803 NW2d 200 (2011). It indicates a choice between two alternatives. *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 148; 783 NW2d

_____

pensation are not permitted by the MMMA. Their position is that the only conveyance of marijuana permitted by the MMMA is the conveyance of marijuana from a primary caregiver to his or her patients. Because defendants' operation of CA involves the selling of marijuana, and because the selling of marijuana is not permitted by the MMMA, we need not, and do not, reach the issue whether the MMMA permits uncompensated patient-to-patient conveyances of marijuana.

133 (2010). Thus, § 4(i) provides immunity to two distinct persons: (1) the person who is "in the presence or vicinity of the medical use of marihuana" and (2) the person who is "assisting a registered qualifying patient with using or administering marihuana." Defendants do not claim immunity on the basis of being in the vicinity of the medical use of marijuana; they claim immunity on the basis of their assistance to registered qualifying patients with "using or administering" marijuana. According to defendants, they assist registered qualifying patients with using or administering marijuana when they transfer marijuana between CA members.

The MMMA does not define the phrase "using or administering" marijuana. Importantly, the phrase cannot be given the same definition as the "medical use" of marijuana. The inclusion of the phrase "medical use" in the vicinity-clause of § 4(i) and its omission and the presence of the phrase "using or administering" in the assistance-clause must be viewed as intentional. See *People v Barrera*, 278 Mich App 730, 741-742; 752 NW2d 485 (2008) ("The omission of a provision in one part of a statute that is included in another should be construed as intentional, and provisions not included by the [drafters of the statute] should not be included by the courts.") (quotation marks and citation omitted). Accordingly, the phrase "using or administering" marijuana must be given a meaning distinct from the definition of the "medical use" of marijuana.

Because the word "administering" is grouped with the word "using," the two words must be given related meaning. See *Manuel v Gill*, 481 Mich 637, 650; 753 NW2d 48 (2008) (stating that words grouped in a list must be given related meaning). The word "use" is included in the definition of the "medical use" of

marijuana. MCL 333.26423(e). Accordingly, we hold that whatever the phrase "using or administering" marijuana means, the phrase has a more limited meaning than that of the "medical use" of marijuana.

The word "use" has numerous dictionary definitions, as does the word "administer." However, each word has a definition that relates directly to controlled substances or medicines, and we find those definitions to be the most relevant. To "use" means "to drink, smoke, or ingest habitually: *to use drugs." Random House Webster's College Dictionary* (1996). To "administer" means "to give or apply: *to administer medicine." Id.* This definition of "administer" is consistent with the PHC definition of "administer." The PHC defines "administer" as "the direct application of a controlled substance, whether by injection, inhalation, ingestion, or other means, to the body of a patient or research subject by a practitioner . . . ." MCL 333.7103(1). Employing these definitions, we hold that a person assists a registered qualifying patient with "using or administering" marijuana when the person assists the patient in preparing the marijuana to be consumed in any of the various ways that marijuana is commonly consumed or by physically aiding the patient in consuming the marijuana.

In this case, defendants, through the operation of CA, participate in the sale of marijuana between CA members. There is no evidence that defendants assist patients in preparing the marijuana to be consumed. Likewise, there is no evidence that defendants physically aid the purchasing patients in consuming marijuana. Because defendants are engaged in the selling of marijuana, which is not assistance with the "using or administering" of marijuana, defendants are not entitled to the immunity granted by § 4(i).

D. PUBLIC NUISANCE

For the reasons discussed previously in this opinion, defendant's operation of CA is not in accordance with the provisions of the MMMA. We, therefore, agree with plaintiff that defendants' operation of CA is a public nuisance and must be enjoined.

A public nuisance is "an unreasonable interference with a common right enjoyed by the general public." *Capitol Props Group, LLC v 1247 Ctr Street, LLC*, 283 Mich App 422, 427; 770 NW2d 105 (2009) (quotation marks and citation omitted). "Unreasonable interference" includes conduct that "(1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting significant effect on these rights." *Cloverleaf Car Co v Phillips Petroleum Co*, 213 Mich App 186, 190; 540 NW2d 297 (1995). Actions in violation of law constitute a public nuisance, and the public is presumed harmed by the violation of a statute enacted to preserve public health, safety, and welfare. *Attorney General v PowerPick Player's Club of Mich, LLC*, 287 Mich App 13, 44; 783 NW2d 515 (2010).

Because defendants possess marijuana, and they possess it with the intent to deliver it to CA members, defendants' operation of CA is in violation of the PHC. Further, their violation of the PHC is not excused by the MMMA because defendants do not operate CA in accordance with the provisions of the MMMA. Through CA, defendants actively participate in the sale of marijuana between CA members, but the medical use of marijuana does not include the sale of marijuana. In addition, even if defendants were engaged in the medical use of marijuana, they would not be entitled to the immunity

granted by § 4(i) because defendants are not assisting registered qualifying patients with using or administering marijuana.

The PHC is designed to protect the health, safety, and welfare of the people of the state of Michigan, MCL 333.1111(2); *Derror*, 475 Mich at 329, and, therefore, the public is presumed harmed by defendants' violation, *PowerPick Player's Club*, 287 Mich App at 44-45. Accordingly, we conclude that defendants' operation of CA is a public nuisance, *id.*; *Cloverleaf Car Co*, 213 Mich App at 190, and the trial court erred by holding otherwise. The trial court's order denying plaintiff's request for a preliminary injunction is reversed. We remand for judgment in favor of plaintiff on its claim that defendants' operation of CA is a public nuisance. The judgment shall include the entry of any order that may be necessary to abate the nuisance and to enjoin defendants' continuing operation of CA. See *PowerPick Player's Club*, 287 Mich App at 48, 54.

Reversed and remanded for entry of judgment in favor of plaintiff and further proceedings not inconsistent with this opinion. We do not retain jurisdiction. This opinion is to have immediate effect. MCR 7.215(F)(2).

No taxable costs pursuant MCR 7.219, a public question being involved.

MURRAY, P.J., and STEPHENS, J., concurred with HOEKSTRA, J.